**UNITED AIR LINES, INC., Plaintiff,**

**v.**

**AUSTIN TRAVEL CORPORATION, et al., Defendants.**

**No. 87 Civ. 1262 (MP).**

United States District Court,
S.D. New York.

Feb. 24, 1988.

As Modified Feb. 29, 1988.

Covington & Burling, Roberts B. Owen, S. William Livingston, Jr., Carolyn F. Corwin, John E. Hall, Washington, D.C., Kaye, Scholer, Fierman, Hays & Handler, Michael Malina, New York City, for plaintiff.

Cravath, Swaine & Moore, David Boies, Stephen S. Madsen, Alan B. Vickery, Rodney L. Stenlake, New York City, for defendants.

## DECISION AND OPINION

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MILTON POLLACK, Senior District Judge.

Plaintiff United Air Lines, Inc. ("United") moves for dismissal of the defendant's defenses and counterclaims and for judgment in plaintiff's favor on the complaint, pursuant to Rule 56, Fed.R.Civ.P. The suit is brought to recover unpaid accrued rentals and damages for breach of leases of equipment by plaintiff to defendant Austin Travel Corporation ("Austin") upon the latter's premature termination of the leases.

United contends that there is no *genuine* defense or counterclaim available to or asserted by Austin herein.

Austin has interposed affirmative defenses to the suit and asserted counterclaims, both of which are largely posited on purported anti-trust law violations by United, its lessor. The defendant's pleading is predicated on the premise that United possesses monopoly power in the relevant CRS market and in the air passenger business. Four species of antitrust violation are charged against plaintiff, viz., 1) monopolization and attempt to monopolize; 2) exclusive dealing contracts foreclosing competition; 3) tie-ins in restraint of trade and

competition; and 4) price discrimination in restraint of competition.

Defendant's counterclaims include demands for an injunction and voiding of plaintiff's subscriber agreements allegedly as part of an unlawful scheme to monopolize the local and national markets for computerized reservation systems and airline passenger services and to engage in unlawful anticompetitive practices in those markets, in violation of §§ 1 and 2 of the Sherman Act and §§ 2 and 3 of the Clayton Act. The counterclaims also assert violations of New York antitrust law.

Austin also claims it had a five year oral contract to be paid 5% override commissions on airline flown revenue in addition to the stipulated 10% commission provided for in the written contract of the parties. United denies any such obligation as is claimed by Austin and points to the written contracts which contain no such provision.

### I. *Procedural History*

The complaint herein was filed February 26, 1987. After the Answer was interposed the parties engaged in extensive discovery of documents and took the depositions of a number of witnesses.

On October 15, 1987, plaintiff served notice of motion pursuant to Rule 56, Fed.R. Civ.P., and Rule 3(g) of the Civil Rules of this Court for summary judgment in plaintiff's favor on the grounds that there is no *genuine* issue as to any material fact and that as a matter of law plaintiff is entitled to relief and defendants are not entitled to relief.

In response thereto, defendant filed five and one-half inches of briefs and appendices containing governmental reports, *e.g.*, Comments and Proposed Rules of the Department of Justice, Notice of Proposed Rulemaking from the Civil Aeronautics Board (CAB), Rules of the CAB, Report from the General Accounting Office on Airline Competition and Hearings before the Subcommittee on Aviation of the Senate. In addition, the materials include affidavits, letters, the lease agreements, their assignments and lengthy (yet sometimes misleading) deposition excerpts.

The motion was duly argued and on November 30, 1987 the Court entered an order directing that specified matters would be heard further on oral testimony. The Court's order stated in part that:

> The Court's effort to extract the facts significant to the motion has been significantly impeded by the nature and scope of the defendant's enormous submission. To pierce the doubts created whether genuine factual controversies, as distinct from mere differences of details, exist so as to warrant a trial of issues, the Court will direct that the following matters be heard further on oral testimony (Rule 43(e), Fed.R.Civ.P.). [The order details these matters.]

Prior to the hearing, defendant requested and was granted leave to take depositions of persons who had submitted affidavits in support of the motion for summary judgment.

The Court heard the alleged evidence on the specified issues which the defendant proffered to show the existence of a genuine issue for trial on relevant matter and due deliberation was had thereon. The requisite evidence thereof is found wanting. The defendant failed to submit admissible specific probative evidence in support of the relevant matter involved herein.

### II. *Standard for Decision—Rule 56*

Summary judgment will be rendered only when no genuine issue as to any material fact exists. Fed.R.Civ.P. 56(c). In assessing whether the evidence presents a genuine dispute as to a material fact, the Court must apply the same standard that governs a directed verdict, *i.e.*, whether, "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

The moving party bears the initial burden of establishing that no relevant facts are in dispute. *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). The movant may discharge that

burden upon a showing of an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Then, if "the nonmoving party ... fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," no genuine issue of material fact exists and the moving party is entitled to summary judgment. *Id.* at 2553. The non-moving party must come forward with "more persuasive evidence to support [its] claim than would otherwise be necessary" if the factual context indicates that the claim is "implausible." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

As stated by the Advisory Committee Notes to the Federal Rules of Civil Procedure, the purpose of the summary judgment procedure is to pierce the pleadings and to assess the proof to see whether there is a genuine need for a trial. To that end, the Court employed the summary procedure of Rule 43(e), Fed.R.Civ.P., by ordering a hearing to assay the alleged probative evidence on several issues. *See Argus Inc. v. Eastman Kodak Co.*, 612 F.Supp. 904, 908–909 (S.D.N.Y.1985), *aff'd*, 801 F.2d 38 (2d Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). A hearing was held to aid the Court in extracting from the avalanche of submissions by Austin the facts significant to the motion solely on the issues of market share of United in the relevant markets, alleged substantial foreclosure of the competition of other vendors, United's use of alleged market power to force Austin to lease United's systems to the exclusion of other systems, alleged price discrimination in restraint of trade, and the claimed unreasonableness of the liquidated damages provisions of the Apollo contracts.

At the hearing, defendant introduced literally no relevant admissible specific probative evidence on any of these issues. Austin relied upon inadmissible hearsay from irrelevant governmental publications, testimony of witnesses without first-hand knowledge of any facts relating to United's practices or to the relevant Long Island

market, and speculative assertions unaccompanied by specific direct evidence. As described below, defendant has not raised any genuine issue of material fact by acceptable factual evidence. In fact, Austin introduced expert testimony that readily disposes of the monopolization and attempt to monopolize and tying counterclaims altogether. Plaintiff's motion for summary judgment will be granted for the reasons indicated herein.

### III. *Background*

The underlying facts as to which it is admitted by defendant in the response to the Rule 3(g) statement by the plaintiff that there is no genuine issue to be tried are the following:

Plaintiff United Air Lines owns and markets to travel agents in Long Island a computerized reservation system ("CRS") known as Apollo. Subscription agreements for Apollo require payment of installation, equipment and subscription charges and permit a travel agent to have access to a vast data bank that includes listings of flights of virtually all airlines, as well as information on many hotels, rental car companies, and other travel services. The agent can use the system to make bookings (or to change or cancel bookings), to print tickets and itineraries, to store relevant information about customers and their travel plans, and to perform a variety of other travel-related functions. United also markets a so-called Apollo Business System (ABS), which is a back-office accounting system that performs travel agency accounting, reporting and management reporting functions.

Among the CRS vendors in the United States are: American Airlines (which markets the "SABRE" system); United Air Lines (which markets "Apollo"); System-One Holdings Inc., a subsidiary of the Texas Air Group, which includes Continental and Eastern Airlines as well as others that have been merged into Continental (which markets the "SystemOne", or "SODA", system); Pars Marketing Corp., which is owned by TWA and Northwest Airlines (and markets the "PARS" system); and

Delta Airlines (which markets the "DATAS II" system).

American's SABRE system is the largest CRS in the United States. SABRE's national market share of CRS transactions for the years 1983 through 1985 exceeded 45%. Approximately 28% of the more than 28,000 travel agency locations in the United States use SABRE as the principal CRS.

Defendant Austin Travel is located and is the largest travel agency of the more than 1,000 travel agencies on Long Island. It is undisputed that prior to 1985 Austin Travel had always used the SABRE CRS at a majority of Austin's locations.

This suit involves United's subscription agreements covering three of Austin's thirteen agency locations on Long Island.

In 1985, Austin Travel had acquired two travel agencies on Long Island, both of which were Apollo subscribers: Karson Travel in Oceanside, New York and Fantasy Adventures in Great Neck, New York.

In August, 1985, Austin Travel executed an assignment agreement pursuant to which it assumed Karson's contract for Apollo Business Systems ("ABS").

In October, 1985, Austin Travel executed an assignment agreement pursuant to which it assumed Fantasy Adventures' Apollo contract.

Also in October, 1985, Austin Travel executed a contract (with United) for use of Apollo in offices in Oceanside and in Mitchell Field, New York.

Austin Travel moved competing CRS systems into the three locations covered by its Apollo contracts. It moved SABRE into the Oceanside and Great Neck locations within a few months after it signed the Apollo contracts. Austin used SABRE along with Apollo at the Mitchell Field location, and it ultimately replaced Apollo with SystemOne at that location.

IV. *United's Breach of Contract Claim*

United seeks $423,155.09, representing unpaid accrued rentals and liquidated and consequential damages for breach of the contracts involved.

In or about June 1986 Austin Travel informed United that Austin intended to install SystemOne at the Mitchell Field location and that Austin Travel would prefer, if United would agree, to have the Apollo equipment installed at Mitchell Field picked up by United, rather than continuing to use it. In or about October 1986, Austin Travel repeated its request to United to remove Apollo equipment from the Austin Travel locations. As of June 1986, the Apollo contracts had not expired and by their terms are stated to extend for periods of more than a year after June 1986. Austin Travel never paid United any amounts for the use of the equipment and services furnished to Austin under the said Apollo contracts referred to above.

Austin Travel informed United that Austin Travel did not intend to use Karson's ABS equipment. Consequently, in or about February 1986, United sent an ABS Suspension Amendment Agreement to Austin Travel, providing that Austin Travel could discontinue its use of ABS, but if it ceased to use Apollo before November 30, 1989, Austin Travel would be obligated to pay United $90,511.43 in liquidated damages under the July 1983 ABS Agreement. Austin contended in its papers that United had orally agreed to relieve Austin of its ABS obligations for a mere deinstallation fee. Austin failed to proffer any specific probative evidence, however, as to why the written agreement should not be enforced.

Austin Travel no longer uses United's Apollo CRS or United's ABS system. Austin Travel never purchased CRS terminals or other CRS equipment from United.

On June 3, 1986, William S. Lush, vice-president, Marketing Automation, Eastern Air Lines, wrote to Austin Travel as follows:

Mr. Jeffrey Austin

Austin Travel

15 Charles Lindbergh

Mitchell Field, NY 11533

Dear Mr. Austin:

This letter is in reference to your existing agreement with United Airlines, Inc. for automated services with the APOLLO system at the above location.

If you should enter into an agreement with Eastern Air Lines, Inc. for automated reservations and ticketing services with Eastern's SYSTEMONE, this is to advise that Eastern will indemnify you with respect to liability to United Airlines arising from the APOLLO agreement, including any expenses and settlement costs associated with litigation that may stem from the termination, but excluding charges outlined in Paragraph 21C.

Very truly yours,

Willaim S. Lush

The said letter was stamped "CONFIDEN-TIAL".

Since this lawsuit was initiated, Austin Travel has refused to permit United's sales representative to make sales calls at Austin Travel.

With respect to Austin's defenses to United's claim for damages for breach of contracts, Austin frivolously contends that plaintiff did not give notice of breach or an opportunity to cure and now fails to identify the nature of the breach. Plaintiff sent monthly invoices which was sufficient notice and clearly identified defendant's breach, enumerating the damages sought. Austin agreed to the terms of the contracts; it used the Apollo Service, but it has never paid a penny for that use. Austin walked away from its contract obligations before the expiration of the terms of the contracts. The mathematics of United's claim are indisputable.

## V. *Defendant's Antitrust Counterclaims*

### A. Monopolization and Attempt to Monopolize

Defendant first counterclaims that plaintiff has a monopoly in the CRS or air passenger business and used its monopoly power to obtain, retain and enhance its power in those businesses, by engaging in exclusionary practices—liquidated damage provisions in the subscription agreements, and so-called rollover and tying requirements—in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### 1. *Monopolization*

There are two elements to a valid monopolization claim under Section 2: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

The relevant market is Long Island; that is the effective area of competition; defendant's travel agencies are located there and defendant would contract for United's services only in that area.

■ It must be established that United possesses a dominant position in that market. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Austin's experts conceded on cross-examination that no airline, excluding American Airlines, enjoys a monopoly in either the air carriage or the CRS market in the New York/Long Island area. Since the crux of a claim of monopolization is possession of monopoly power, and since United lacks monopoly power, Austin's claim fails.

The "existence of monopoly power ... is 'the primary requisite to a finding of monopolization.'" *Id.* Monopoly power is defined as "the power to control prices or exclude competition." *United States v. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

The record herein permits no reasonable inference other than that United lacks monopoly power in the CRS and the air passenger businesses in Long Island, or elsewhere for that matter. The record contains no significant probative evidence concerning the market structure of the CRS and air passenger businesses to show that United's share of those markets give it monopoly power. *See Broadway Delivery Corp. v. United Parcel Service of America*, 651 F.2d 122, 129 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *Nifty Foods Corp. v.*

*Great Atlantic & Pac. Tea Co.,* 614 F.2d 832, 841 (2d Cir.1980). There is an ample supply of substitutes for United to whom travel agents can turn to obtain CRS and ABS systems. Since United lacks monopoly power in the relevant market, the monopolization claim must be dismissed.

### 2. *Attempt to Monopolize*

Austin also claims an attempt to monopolize by United, in violation of Section 2 of the Sherman Act. Three elements must be established: 1) anticompetitive or exclusionary conduct; 2) specific intent to monopolize, and 3) a dangerous probability that the attempt will succeed. *International Distrib. Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 790 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

■ Austin's expert conceded on cross-examination that no reasonable or realistic risk exists that United will achieve a monopoly of the CRS or air carrier business in the New York City/Long Island area. There being no probability, let alone a dangerous probability, that an alleged attempt to monopolize will succeed, Austin's claim must be dismissed.

### B. Unreasonable Restraint of Trade

Austin's second antitrust counterclaim is for an unreasonable restraint of trade, resulting from supposed tie-in and exclusive dealing provisions in United's contracts with Austin, in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.

### 1. *Tying*

A tying arrangement is "an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

The law requires proof of the existence of five elements to establish an antitrust violation due to illegal tying: (1) two distinct products; (2) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the tied market; and (5) involvement of not an insubstantial amount of interstate commerce in the tied product market. *Power Test Petroleum Distribs. v. Calcu Gas, Inc.,* 754 F.2d 91, 96 (2d Cir.1985).

Once again, the element of control is crucial. Tying arrangements are condemned "when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 13–14, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984). Market power is synonymous with monopoly power. *International Distrib. Centers,* 812 F.2d at 791 n. 3.

The defendant asserts that United promotes an invalid tying arrangement in the leasing of its Apollo systems. However the record does not provide a basis for applying the per se rule against tying to the presumed arrangement, not shown in fact to exist by admissible, specific probative evidence.

■ Tying arrangements need only be condemned if they restrain competition by forcing purchases or leases that would not otherwise be made; there must be a showing of acceptable evidence that an unreasonable restraint of competition occurred. The evidence thereof is lacking. There has been no showing that the market as a whole for CRS or ABS has been in anywise affected by the Apollo contracts through unreasonable restraint of competition. There is no evidence to show that United has power in the alleged tying product market; nor is there any admissible evidence to shed light on how the alleged tying arrangement appreciably affected consumer demand for separate arrangements with a specific travel agent. *See Jefferson Parish Hospital,* 466 U.S. 2, 104 S.Ct. 1551.

Austin failed to establish at the Rule 43(e) hearing or otherwise that United possesses market power in any product market; indeed the proof established the ab-

sence thereof, thus United could not possibly force a purchase of another product. Austin's tying claim must be dismissed.

### 2. *Exclusive Dealing*

An exclusive dealing arrangement "does not violate [Section 3 of the Clayton Act] unless ... it [is] probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

Austin alleges *de facto* exclusive dealing in United's rollover, minimum use and liquidated damages provisions. Austin theorized, but gave no evidentiary proof, that any of these provisions deter agents or make it impossible for them to fulfill contracts with other vendors or deterred Austin from switching CRS vendors. Austin's witness acknowledged that the rollover clause was not employed in any part of the Austin Travel contracts.

The Apollo contract itself states that it is nonexclusive:

> United and Subscriber acknowledge that this is a non-exclusive agreement and nothing in this Agreement will be construed as precluding or prohibiting Subscriber from using any other computerized reservation service or system in its operations. United and Subscriber also acknowledge, however, that the monthly fixed charges under this Agreement have been established at a level which reflects the expectation that Subscriber will actively use Apollo Services in its operations to process Apollo Transactions.

There is an entire absence of probative evidence of a foreclosure of competition by United or that Austin or any other agent was prevented from the use of the CRS services or air passenger services of another vendor. Austin has always used SABRE, PARS, SystemOne and DATAS II (all of which are competitive CRS systems) under five-year contracts and Austin in fact rejected the Apollo system and had United remove it. The Apollo contracts affect only three of thirteen Austin Travel loca-

tions. With 1000 agencies on Long Island and 28,000 in the United States, any market foreclosure would be *de minimis* (approximately 0.77%). In addition, other major carriers, such as American Airlines and TWA, have five-year contracts with travel agencies similar to United's.

In practical application the United contract does *not* prevent lessees of CRS or Business Systems from using or dealing in the systems of a competitor and competition has not been foreclosed in a substantial share of the line of commerce affected. *See Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. at 628.

The market area in which United operates and to which Austin can turn for CRS systems—the area of effective competition in the known line of commerce—is Long Island. *Id.* "Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition." *Id.* at 328, 81 S.Ct. at 628 (quoting *Standard Oil Co. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949)).

United's share of the only relevant market, 3% of the agencies and 8% of the revenues from CRSs, was insubstantial and was not sufficient to foreclose competition in that area. *See Tampa Elec.*, 365 U.S. at 328, 81 S.Ct. at 628. That dictates a finding that United's Apollo contracts were not a clog on competition required to be removed by the application of antitrust legislation. Since the contracts of United do not fall within the broader proscription of § 3 of the Clayton Act it follows that they are not forbidden by §§ 1 or 2 of the Sherman Act.

### C. Price Discrimination

Austin's final antitrust counterclaim alleges illegal price discrimination in violation of Sections 1 and 2 of the Sherman Act and Section 2 of the Clayton Act, as amended by the Robinson–Patman Act.[1] Under the Robinson–Patman Act,

---

**1.** The Robinson–Patman Act provides, in perti-     nent part:

Three elements are necessary to state a claim for an actionable violation.... Plaintiff must complain that (1) the alleged price discrimination meets the 'in commerce' requirement, i.e., that 'either or any' of the purchases involved are in commerce; (2) there has been discrimination in price between different purchasers of products of like grade and quality; and (3) the effect of the discrimination 'may be substantially to lessen competition or tend to create a monopoly.'

*Energex Lighting Indus. v. North American Phillips Lighting Corp.,* 656 F.Supp. 914, 919 (S.D.N.Y 1987) (quoting *Hoyt Heater Co. of Northern California v. American Appliance Mfg. Co.,* 502 F.Supp. 1383, 1386–87 (N.D.Cal.1980)).

Austin alleges that United offered override commissions and Apollo contracts to other agents on more favorable terms than to Austin, and that United's power affects competition among agents and therefore among airlines and CRS vendors. Austin argues that there exists a genuine issue of fact as to its allegations.

█ Not a scintilla of specific identifiable evidence is proffered to show that alleged price discrimination led to a substantial lessening of competition or even a possibility that competition may be lessened; no injury to competition is even mentioned in Austin's inflated papers. Since Austin's experts readily acknowledged on the witness stand that United does not have monopoly or market power in either the CRS or air passenger business, United is perforce unable to wield power to affect competition.[2]

The law is crystal clear: Absent monopoly power coupled with an improper monopolistic purpose the claimed antitrust violations fall to the ground. The evidence shows that the assertion by Austin that United had or has monopoly power in the CRS business or in the air passenger business was frivolous and had no basis in fact. There is no genuine basis on which to claim that United's contracts or activities interfered with competition in the relevant market or threatened to do so.

Austin made no effort to defend the original monopoly allegations of the pleadings. However, Austin advances two ploys not revealed by its pleading; it now asserts in its opposing papers that United possesses and has abused its alleged monopoly power in the "convention market on Long Island" and in "the market for airline access to travel agents who use Apollo."[3]

The alleged antitrust violations are mere bald contentions without any admissible specifically identifiable evidence submitted to support them. None is supported by the requisite show of evidence to provide a hook on which to hang violative conduct, viz., exclusive dealing contracts (here, suggesting use of the Apollo contract prevents use of the CRS contracts of another vendor of CRS), tie-ins to foreclose competition (here, suggesting use of supposed market power in one product to force a purchase of another), or of price discrimination in restraint of trade and competition. Not a scintilla of specific identifiable evidence is proffered to show that alleged price discrimination led to a substantial lessening of competition; no evidence of injury to competition is even mentioned by Austin.

In addition, the "convention market" allegations are illusory. Convention booking does not constitute a special submarket;

---

It shall be unlawful for any person engaged in commerce in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce....

15 U.S.C. § 13(a).

**2.** The issue of whether the Robinson–Patman Act even applies to this case, *i.e.,* whether "commodities" are involved, need not be addressed. As to the Sherman Act, price discrimination "is not and never has been within the purview of the Sherman Act." *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 344 N.E.2d 357, 381 N.Y.S.2d 426, 428 (1976).

**3.** Austin's counterclaim contained no reference to monopolization of these markets.

rather such business is a treatment of volume bookings within the relevant general market of computerized reservations which neither requires nor utilizes special vendors or distinct customers. *Cf. Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). A discount operation for computerized reservations does not create a separate economic entity nor does it create a separate product so as to constitute a submarket.

Apart from the foregoing, United has no monopoly of the convention business. Convention business for an airline involves provision of transportation for people who are traveling from around the country to a convention. There is no "Long Island market" for convention travel. Every major airline competes for convention travel, just as they compete for travel of other persons and groups, and each offers special deals to attract convention business.[4] Austin Travel itself entered into convention agreements with most other airlines besides United. A monopoly is not created simply because United offered a form of contract that differed from some used by other air carriers. Other airlines, including Texas Air, are obviously in a position to offer competitive convention packages by providing discounted fares, for example. Even if United offered the most lucrative convention contract, that would show only that United offered the most competitive price, and would neither confer nor reflect monopoly power.

Neither can a cognizable "market for airline access to travel agents who use Apollo" be defined. By owning the Apollo system, United possesses a share of this "market" that approaches 100 percent. United never possessed monopoly power of "airline access" to Austin Travel or any other agency. Austin Travel always used other CRS systems, principally SABRE, and other airlines had continuous access to Austin Travel and to other agents. Austin's sales of airline tickets on other carriers greatly exceed its sales on United, and it treats American and Texas Air as its "preferred carriers."

Austin Travel has made no showing of admissible evidence that United has the power to control price and exclude entry in the semantically created convention or the imaginary "airline access to travel agent" markets or in any other markets.

## VI. *Liquidated Damages Defense*

Austin raises a defense that United's liquidated damages clause is void and unenforceable as a penalty.[5]

Under the contract with Austin, United received from the agent a monthly fixed fee for usage of the system. In addition, United received certain "variable" charges based upon the agent's generation of tickets or itineraries. When an agent terminates its Apollo contract prior to the end of its term, United loses the monthly fixed charges it was scheduled to receive during the remainder of the contract term. In addition, it loses the variable charges that Austin would have paid if it had continued to generate tickets and itineraries through Apollo Services rather than through the

---

4. Examples of advertising and promotional materials relating to the convention offerings of other carriers have been submitted. They include a boast by Eastern Airlines (a Texas Air affiliate) that it was the "preferred carrier" for 5000 conventions in 1986.

5. United's contract provides, in pertinent part: Subscriber will pay to United liquidated damages in an amount calculated as follows:
   A. The amount of the monthly fixed charge ... will be multiplied by the number of months, including any portion thereof, remaining under the term of this Agreement and the product thereof multiplied by .80;
   B. The amount of the variable charges ... paid by Subscriber for the calendar month immediately preceding the date of termination will be multiplied by the number of months, including any portion thereof, remaining under the term of this Agreement and the product thereof multiplied by .80;
   C. The Monthly Minimum Guarantee will be multiplied by the amount of the airline booking fee in effect on the date of termination and the product thereof will be multiplied by the product of the number of months, including any portion thereof, remaining under the term of this Agreement multiplied by the number of Apollo CRTs ...; and
   D. The amount of the liquidated damages will equal the sum of the amounts derived under [A., B., and C.].

replacement system. The amount of variable charges paid by the agent in the month preceding the contract termination has been selected by United as the best approximation of the charges an agent would have continued to pay if it had adhered to the Apollo contract.

When an existing subscriber abandons Apollo prior to expiration of the contract term, United does not recoup part of its loss by placing that subscriber's equipment elsewhere. In effect, United loses the entire amount of the subscriber's business.

Most of the costs associated with Apollo are either fixed or incurred in the early stages of a contract. However, there are some costs that United will not incur after Apollo is removed from an agency. In consultation with individuals in Apollo Services, United determined that, generally, these *avoidable costs were less than 20 percent of the amount of revenue from the monthly fixed usage fees and variable charges.* United therefore drafted the liquidated damage provision in such a way as to permit United's recovery of only 80% of its fixed and variable charges and thus to provide the agent with more than ample benefit for the costs United avoids as a result of an agent's premature termination of an Apollo contract.

Each time a travel agent makes a booking on an airline or with another vendor through the Apollo Services, that airline or vendor pays a booking fee to United. When an agent terminates Apollo prematurely, United loses the booking fees it otherwise would have received as a result of the agent's use of Apollo. For contracts entered into after early 1985 United has included in the calculation of liquidated damages a minimum amount of lost booking fees.

United's Apollo contract requires an agent to book only a minimum amount of business through Apollo—50 percent of the average level of bookings the agent made on Apollo in the early months of its contract. In drafting the liquidated damage provision, United based an element of liquidated damages on the minimum level that the agent was expected and required to

book under the Agreement. Thus, even if the agent in fact has continued to book far more than this minimum level, United's liquidated damages formula conservatively assumes only the revenue from other airlines associated with the agent's minimum booking level.

A liquidated damage clause in a contract provides an estimate, made by the parties *at the time they enter into their agreement,* of the injury that would be sustained due to a breach of the agreement. 5 Williston, Contracts § 776 (3d ed. 1961). Such provisions are enforced "if the Court is convinced that it is a genuine pre-estimate by the parties of the extent of injury that will be caused by a future breach of the contract." 5 Corbin, Contracts § 1059 (1964).

A sum becomes a penalty rather than an enforceable damage liquidation clause if it is disproportionate to the damage which could have been anticipated from a breach of the contract, and which is agreed upon in order to enforce performance of the main purpose of the contract by the compulsion of this very disproportion. 5 Williston, Contracts § 776.

Under New York law, where the actual damages are uncertain and difficult to ascertain or prove, or are of a peculiarly speculative character, and the contract furnishes no data for their ascertainment, a stipulated amount which on the face of the contract does not appear to be unreasonable ·or disproportionate to the probable loss will be held to be one for liquidated damages rather than a penalty. 36 N.Y. Jur.2d, Damages § 160 (1984). The standard applicable is "whether the provision constitutes a reasonable attempt to estimate damages which, though real, may be uncertain in amount." *Staten Island Rapid Transit Ry. Co. v. S.T.G. Constr. Co.,* 421 F.2d 53, 59 (2d Cir.), *cert. denied,* 398 U.S. 951, 90 S.Ct. 1871, 26 L.Ed.2d 291 (1970).

The Second Circuit has applied this standard:

Contractual provisions fixing liquidated damages in the event of breach will not be voided as unconscionable or contrary

to public policy if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. *Leasing Service Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir.1982). In that case the Second Circuit upheld a lease provision permitting the lessor to resell trucks and heavy equipment repossessed upon breach by the lessee and deduction of 15% of the total rent required for the entire unexpired term. The value of the lessor's interest in the repossessed equipment depended upon the equipment's condition and market conditions when the equipment was returned. Both of these were "incapable of precise estimation" at the time of execution of the lease. *Id.* at 74.

Acceleration clauses are upheld in long-term leases for equipment. *Walter E. Heller & Co. v. Video Innovations Co.*, 730 F.2d 50 (2d Cir.1984).

■ The Court is convinced that the United liquidated damage clause is standard and vindicated by industry practice. Indeed, the CRS contracts of the competitors of United were even more stringent; they called for payment of 100% of the rentals for the unexpired term while the United contract obligated Austin for only 80% thereof. The terms of United's contract were a genuine pre-estimation by sophisticated parties fully aware of the terms and of the nature of the injury that would be caused by a future breach of the lease. Defendant has failed to show the existence of any proof available to it to the contrary. The disputable analysis of presumed cost savings belatedly submitted by Austin does not discredit the reasonableness of United's anticipatory estimate in light of the anticipated or actual loss caused by the breach and the difficulties of proof.

The elements of cost avoidance to United following a breach of an Apollo contract merely demonstrate in theory that there was reasonable ground for the agreed-in-advance quantum of lost future benefits to United at 80% thereof as stated in the contract rather than the 100% thereof charged by United's competition.

Clearly the actual damages from the breach of contract were uncertain when the parties sat down to contract and were difficult both to ascertain or prove thereafter and the contract furnishes no data for their ascertainment. The estimate of damages was made by knowledgeable, sophisticated businessmen in the industry on both sides acting at arm's length without any coercion or inability to contract freely. The amount of United's actual loss was difficult, indeed incapable of precise estimation, and the amount liquidated has been shown without contradiction to bear a reasonable proportion to the probable loss.

The only element that could be said to be capable of objective estimation precisely in the liquidated damages formula was the amount of the loss of the booking fees payable by the airlines. But these could be ascertained only retrospectively since they are being pocketed by Eastern based on the transactions of SystemOne which substituted for Apollo at Austin. As to these, the damage clause does not call for all the amount reaped by SystemOne, but only the pre-estimated amount thereof calculated at the minimum booking level of Austin, which would yield a lower figure than the amount reaped by SystemOne.

It is interesting to note that the Department of Justice after its investigation of liquidated damage clauses came to the conclusion that "a rule abrogating liquidated damages should be approached cautiously because there may be good reasons for the new liquidated damage clauses, such as the need for vendors to compensate themselves for the shorter 5-year contract period required by the rules. A prohibition on liquidated damages clauses might also handicap potential entrants more than it assists them." The defendant's expert was asked, "Are you in disagreement with the conclusion stated there by the Department of Justice?" He responded: "No, I am not."

Invoices covering amounts owed to United by Austin Travel Corporation under the terms of two subscriber lease agreements for Apollo Reservations and Ticketing Services were prepared and forwarded by United to Austin. Contract number 79566

covers Apollo Services for Austin Travel's Oceanside, New York, and Mitchell Field, New York, locations. Contract number 60195, which was assumed by Austin Travel pursuant to an assignment agreement, covers Apollo Services for Fantasy Adventures, Great Neck, New York. The total amount invoiced to Austin Travel under the terms of the two Apollo agreements referred to above is $305,205.56. Austin Travel has never paid this amount or any portion thereof.

The total amount invoiced in connection with Apollo for the Oceanside location was $72,866.04. Of this amount, $10,222.09 represents unpaid monthly fixed and variable charges and installation fees accrued by Austin Travel for the period February 1986 through November 1986; $541.25 represents a deinstallation charge; and $62,-102.70 represents liquidated damages owed by Austin Travel as a result of its termination of Apollo at the Oceanside location, calculated pursuant to paragraph 21 of Contract No. 79566. The figure for liquidated damages for the Oceanside location includes amounts representing a percentage of the monthly fixed charges and variable charges that would have been paid to United during the remainder of the contract term and an amount representing a minimum level of booking fees United would have received as a result of Austin Travel's use of the Apollo system during the remainder of the contract term.

The total amount invoiced in connection with Apollo for the Mitchell Field location was $217,185.06. Of this amount, $16,-127.90 represents unpaid monthly fixed and variable charges accrued by Austin Travel for the period January 1986 through November 1986; $1,604.00 represents a charge for partial deinstallation; $1,317.60 represents a charge for final deinstallation; and $198,135.56 represents liquidated damages owed by Austin as a result of its termination of Apollo at the Mitchell Field location, calculated pursuant to paragraph 21 of Contract No. 79566. The figure for liquidated damages for the Mitchell Field location includes the same components as those described above in connection with the Oceanside location. The final summary invoice for this location inadvertently included $5,808.47 in Apollo Business System (ABS) charges and this amount has been deducted in reaching the total amount owed under the Apollo contract for this location ($217,185.06).

The total amount invoiced in connection with Apollo at the Great Neck location was $15,154.46. Of this total, $5,168.06 represents unpaid monthly charges accrued by Austin Travel for the period December 1985 through October 1986; $540 represents a deinstallation fee; and $9,446.40 represents liquidated damages owed by Austin as a result of its termination of Apollo at the Great Neck location, calculated pursuant to paragraph 21 of Contract No. 60195. The figure for liquidated damages for the Great Neck location includes amounts representing a percentage of the monthly fixed charges and variable charges that would have been paid to United during the remainder of the contract term.

The total amount invoiced in connection with ABS at the Mitchell Field location was $117,949.53. This includes monthly charges and liquidated damages calculated pursuant to paragraph 21 of Contract No. 59484.

The total amount owed to United by Austin Travel for unpaid Apollo and ABS invoices is $423,155.09.

Attachment A to this decision shows the manner in which liquidated damages were calculated for Apollo for each of the three Austin locations at issue herein.

Attachment B to this decision shows the manner in which United calculated the early termination charges owed by Austin Travel in connection with its decision to remove the ABS system in late 1986.

The liquidated damage clauses in United's contract are reasonable and no valid proof has been shown by the defendant to be available to it to the contrary and the terms thereof are enforceable.

VII. *Other Affirmative Defenses*

A. Waiver

Defendant's third affirmative defense is that plaintiff waived its right to recover

liquidated damages because United released other agents from paying them. Austin has failed to produce probative evidence of factual support for this defense.

■ The Apollo contracts contain a provision dealing with waiver: "The right of either party to require strict performance and observance of any obligations hereunder will not be affected in any way by any previous waiver, forbearance or course of dealing." From the terms of the contracts, therefore, it appears that United has not waived its right to liquidated damages.

Furthermore, although "[e]ither party to a contract may waive any of its provisions made for his benefit[,] [t]he intent to waive must be clear and unambiguous." *Liberty Mut. Ins. Co. v. Lodha,* 131 Misc.2d 670, 500 N.Y.S.2d 989, 991 (Sup.Ct.1986).

■ United certainly gave no indication of an intent to relinquish its right to collect liquidated damages from Austin. Moreover, Larry Austin recognized United's policy of enforcement of these clauses. The only evidence that Austin offers is testimony of a United representative describing United's use of "suspension agreements," under which United would allow an agency to terminate Apollo use at one location in exchange for the right to install Apollo if the agency opened a new location. The deponent did not know whether Apollo demanded payment of liquidated damages in those instances. In addition, a former United employee testified at the Rule 43(e) hearing that United's policy was to enforce its contracts with travel agencies.

### B.  Failure to Install Terminals

Austin raises as its fourth affirmative defense United's alleged failure to install Apollo terminals at the Great Neck location. Austin admits, however, that it had no intention of preparing that office for installation and it never did prepare it.

### C.  Coercion and Duress

Austin also raises as a defense that any contracts with United were executed by Austin under coercion and duress, due to United's alleged exercise of monopoly power and illegal tying arrangements. No probative evidence was adduced to support this extreme suggestion.

■ It has already been shown that United possesses *no* monopoly power and was not engaged in any illegal tying arrangements whatsoever, which alone preclude any possibility of coercion or duress by United.

### VIII.  *Breach of Override Contract Counterclaim*

Austin claims that United breached an oral agreement under which United allegedly promised to pay override commissions of a flat additional 5% for five years on all United sales. The parties allegedly entered into this oral agreement prior to the execution of the written override contracts between Austin and United that did not provide for such a flat fee but instead linked overrides to Austin's volume of United sales. United raises the parol evidence rule and the statute of frauds as defenses to Austin's claim. Either or both of these constitutes a complete defense to the claimed oral override.

### A.  Parol Evidence Rule

When an agreement has been reduced to writing, "evidence of prior or contemporaneous agreements may not be offered to contradict, vary, or subtract from the terms of the writing." *Wallace Steel, Inc. v. Ingersoll–Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984) (finding that the oral testimony permitted to be introduced by the district court did not vary the terms of the contract). *See also* Restatement (Second) of Contracts § 215 ("evidence of prior or contemporaneous agreements of negotiations is not admissible in evidence to contradict a term of the writing").

■ Conversations between Larry Austin and the United sales representative(s), in which United allegedly promised the flat additional override commissions, could be offered solely to contradict the terms of the written 10% override contracts subsequently executed and are thus inadmissible under the parol evidence rule.

### B. Statute of Frauds

An agreement not reduced to writing is not enforceable if by its terms it is not to be performed within one year from the making of the agreement. N.Y.Gen. Oblig.Law § 5–701 (McKinney 1978 & Supp.1987); *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.*, 614 F.2d 832, 837 (2d Cir.1980) ("By its terms the alleged contract could not have been performed within one year, and [plaintiff] failed to present a writing . . . .").

■ The alleged oral agreement falls within the Statute of Frauds and is therefore unenforceable as an agreement not to be performed within one year.

Austin argues that, even if the alleged agreement falls within the Statute of Frauds, Austin relied on United's oral representations and would not have entered into Apollo contracts otherwise. Austin relies on *L. Fatato, Inc. v. Miller Brewing Co.*, 582 F.Supp. 1377, 1379 (E.D.N.Y.1984), in which the court denied a motion for summary judgment, stating that although the doctrine of promissory estoppel has not been given a "warm reception in New York," the plaintiff should have an opportunity to establish the facts which might support an estoppel. Austin has not claimed any such facts.

Austin further argues that it partially performed the override contract, which, it posits, removes the agreement from the Statute of Frauds.

"Part performance that is clear, certain and definite in object and design as to be unequivocally referable to the agreement, and which will precipitate a fraud if the agreement is not enforced, removes the action from the defense of the statute of frauds." *Marcraft Recreation Corp. v. Francis Devlin Co.*, 506 F.Supp. 1081, 1085 (S.D.N.Y.1981). The criteria for estopping the use of the statute of frauds defense are "(i) a fraudulent oral promise by the defendant; (ii) upon which the plaintiff justifiably relies; (iii) by engaging in acts which are 'unequivocally referable' to the oral promise; (iv) resulting in substantial injury to plaintiff." *Id.* at 1086. If the part performance is "equally consistent with an explanation having a basis in other than the alleged oral agreement," however, such as an agreement that could be performed within a year, the part performance relied upon does not remove the agreement from the statute of frauds. *Cunnison v. Richardson Greenshields Securities Inc.*, 107 A.D.2d 50, 485 N.Y.S.2d 272, 276–77 (1st Dep't 1985).

Austin contends that it began to promote United as one of its preferred carriers, something it had never done before, which is partial performance that refers to the oral override contract. Austin's acts could, however, be equally consistent with performance under the written override contracts, and Austin's breach of override contract claim must be dismissed.

### IX. *Conclusion*

Plaintiff is entitled to judgment in its favor dismissing the defenses and counterclaims asserted in the Answer. The Clerk is directed to enter judgment in plaintiff's favor for $408,375., together with interest from February 26, 1987 and costs.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

So Ordered

### ATTACHMENT A

1. Oceanside Location (Contract No. 79566, ¶ 21)—early termination charge of $62,102.70.
   a) $630 (monthly fixed charge for Oceanside location per Attachment A to contract) times 44 (months remaining in term of contract) times .80 = $22,176.
   b) No variable charge component.
   c) 163.5 (50% of average of bookings per CRT for first six months for Oceanside and Mitchell Field locations) times 44 (months remaining in term of contract) times $1.85 (booking fee) times 3 (number of CRTs at Oceanside) = $39,926.70.
2. Mitchell Field Location (Contract No. 79566, ¶ 21) early termination charge of $198,135.56.
   a) $1,330 (monthly fixed charge for Mitchell Field location per Attachment A to contract) times 44 (months remaining in term of contract) times .80 = $46,816.00.

b) $139.82 (variable charges from 10/86 invoice) times 44 (months remaining in terms of contract) times .80 = $4,921.66.

c) 163.5 (50% of average of bookings per CRT for first months for Oceanside and Mitchell Field locations) times 44 (months remaining in term of contract) times $1.85 (booking fee) times 11 (number of CRTs at Mitchell Field) = $146,397.90.

3. Great Neck Location (Contract No. 60195, ¶ 21)—early termination charge of $9,446.40.

a) $492 (monthly fixed charge per Attachment A to contract, with 8% escalation per contract) times 24 (months remaining in term of contract) times .80 = $9,446.40.

b) No variable charge component.

### ATTACHMENT B

Apollo Business Systems (Contract No. 59484, ¶¶ 16D, 21)—early termination charge of $73,884.47.

a) $1,732.12 (monthly continuing use charge) times 21 (months remaining in term of contract) times .80 = $29,099.62.

b) $44,784.85 (remaining principal under contract at time of termination).