**UNITED AIR LINES, INC., et al.**

v.

**HEWINS TRAVEL CONSULTANTS, INC.**

Supreme Judicial Court of Maine.

Argued Nov. 4, 1992.
Decided March 31, 1993.

---

Roy S. McCandless (orally), James G. Goggin, Verrill & Dana, Portland, for plaintiffs.

James C. Hunt (orally), Robinson, Kriger, McCallum & Greene, Lynn Spann Bowditch, Cope and Cope, Portland, for defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS and RUDMAN, JJ.

COLLINS, Justice.

Hewins Travel Consultants, Inc. appeals from the summary judgments entered in favor of United Air Lines, Inc. and Covia Partnership in the Superior Court (Cumberland County, *Wernick, A.R.J.*) in an action against Hewins for breach of contract. Hewins asserts that: 1) the contracts are

unenforceable because their minimum use provisions violate federal Department of Transportation (DOT) regulations; 2) the computer records relied on by United and Covia to establish breach are inadmissible hearsay; 3) the contract terms were ambiguous; and 4) the liquidated damages clause is an unenforceable penalty. United and Covia cross-appeal the court's denial of their post-judgment motion for attachment and attachment by a trustee process. We affirm the summary judgments and remand for consideration of the plaintiffs' motion for post-judgment attachment but not attachment by a trustee process.

In 1985, United entered into three contracts with Gordon Clapp Travel Services, Inc. (Clapp). Pursuant to these contracts United leased to Clapp a computer reservation system (the "Apollo" system) for a term of five years. The Apollo system consists primarily of a network of display terminals (CRTs) linked to a central data base containing travel information. Computer reservation systems such as Apollo are used by travel agencies to obtain information on the available flights, hotel rooms, car rentals, and other travel-related services, and to make, change, or cancel reservations.

United charged Clapp a fixed fee for installing and leasing the equipment as well as for subscription fees for the various services used. United also received "booking fees" from other vendors for reservations made by the agency. Under the Apollo leases, Clapp agreed to meet a monthly minimum usage requirement defined in the Apollo leases as:

> fifty percent (50%) of the monthly per CRT mean average of Apollo Transactions processed by the Subscriber ... during the first six (6) months of the Agreement.

In the spring of 1987, Hewins purchased Clapp and assumed the Apollo lease agreements. At about the same time, Hewins began to negotiate with Delta to convert its computer reservation system from "Apollo" to "DeltaStar." As part of the agreement, Delta agreed to either pay Hewins

$250,000 for "expenses associated with the termination of United Airlines Apollo Systems" or to indemnify Hewins on the Apollo contract. Hewins chose the cash option. Once DeltaStar was installed, Hewins kept the Apollo CRTs on its agents' desks for information services but dramatically reduced its use of the Apollo system for making reservations.

In the spring of 1988, United assigned its interest in the Apollo leases to Covia, at that time a wholly-owned subsidiary of United. Shortly thereafter, in May 1988, Covia notified Hewins that Hewins was in breach of the Apollo contracts for failing to meet the minimum usage requirement for "some time." In June 1988, Covia notified Hewins that it terminated the contracts "due to [Hewins's] failure to cure [its] breach" and that Hewins would be liable for liquidated damages under the terms of the contracts.[1]

United and Covia filed a complaint for a breach of the contracts in June 1989. Although the Superior Court (Cumberland County, *Wernick, J.*) denied United and Covia's first motion for summary judgments, it granted their second motion after discovery eliminated the factual ambiguities in the case. The court directed its order be entered as a final judgment pursuant to M.R.Civ.P. 54(b). United and Covia moved for a post-judgment *ex parte* attachment and attachment by a trustee process which the court denied.

## I.

### *The Minimum Use Provisions and DOT Regulations*

 When reviewing the grant of a summary judgment, we review the evidence in a light most favorable to the party against whom the judgment has been granted and review the trial court's decision for error of law. *Estate of Althenn v. Althenn,* 609 A.2d 711, 714 (Me.1992). Hewins argues that the minimum use requirement in the contracts violates DOT regulation, 14 C.F.R. § 255.6(b), which reads: "No system vendor shall directly *or indirectly* prohibit

---

1. Details of the liquidated damages clause are discussed in Section IV of the opinion.

a subscriber from obtaining or using any other system." 14 C.F.R. § 255.6(b) (1992) (emphasis added). Hewins asserts that the minimum use clause indirectly prohibits it from obtaining or using another system.

■ Hewins first raised this issue in a motion for dismissal which was denied by the Superior Court (Cumberland County, *Cole, J.*). Hewins renewed this defense in its answer. On a motion by United and Covia, the Superior Court (Cumberland County, *Perkins, J.*) struck the defense under the law of the case doctrine. Hewins argues, as a preliminary matter, that this was error because the law of the case cannot be established on a motion to dismiss.

■ The law of the case doctrine is based on "the sound policy that in the interests of finality and intra-court comity a Superior Court justice should not, in subsequent proceedings involving the same case, overrule or reconsider the decision of another justice." *Grant v. City of Saco,* 436 A.2d 403, 405 (Me.1981). Although the rule does not act as a complete bar to reconsideration, we have held that a judge may decline to review an issue already determined on a motion for dismissal. *Id.* The court's decision to strike an issue already decided by a previous justice on a motion to dismiss provides Hewins no grounds for relief. *See id.*

■ United and Covia also raise preliminary matters. First, they maintain that Hewins did not properly preserve the DOT regulation issue because they did not raise this argument in opposition to the plaintiffs' second motion for a summary judgment. This contention is meritless; Hewins is not required to continue to raise an issue struck from the case. United and Covia further argue that Hewins cannot use the violation of a DOT regulation as a defense to the contract action because the

regulation provides no private cause of action. We need not reach this issue, however, because regardless of whether a private right of action exists, the minimum use clause does not violate section 255.6(b). *Cf. In re "Apollo" Air Passenger Computer Reservation System (CRS),* 720 F.Supp. 1061, 1065 (S.D.N.Y.1989) (in similar suit by United, identical minimum use provision held not to violate section 255.6(b)). The minimum use clause "merely sets a benchmark for use equal to one half of the average use during the first six months of a contract." *Id.* Clapp was free to control its own use of the Apollo system during the first six months of the contract to establish the minimum usage requirement and Hewins assumed Clapp's liability under the contract.[2]

Hewins points out that since *In re "Apollo"* was decided, the DOT has amended its rules to expressly prohibit minimum use provisions. *See* 57 Fed.Reg. 43,836 (1992) (to be codified at 14 C.F.R. § 255.8). Hewins asserts that this DOT action clarified that section 255.6(b) was intended to prohibit minimum use clauses. We reject this contention. In discussing its amendments, the DOT stated that the current regulations were inadequate to prevent minimum use clauses. The fact that section 255.6(b) failed to accomplish its goals is not reason to interpret it differently than it was written and interpreted by both the DOT and the courts.

## II.

### *Computer Printouts*

■ To establish the number of Apollo transactions occurring during the first six months of the contract, Covia introduced three affidavits of Philip Tarrant, its Manager of Legal Services.[3] Tarrant attached to his third affidavit computer printouts

---

**2.** Although Hewins initially argued that the minimum use requirement should be determined by its first six months of usage and not Clapp's usage, this issue is not raised on appeal.

**3.** Although Hewins challenged the first affidavit on the basis of conclusory statements, it did not object to the form of the other affidavits pursu-

ant to M.R.Civ.Proc. 56(e); therefore it failed to preserve this issue in regard to those affidavits. *See Kennebunk Savings Bank v. West,* 538 A.2d 303, 304 n. 1 (Me.1988) (although affidavits did not comply with M.R.Civ.Proc. 56(e) party who failed to object to the affidavits waived its right to claim error.)

showing the total Clapp/Hewins bookings for each month during the life of the contract.

Tarrant described the data collection process as follows: First, whenever Clapp or Hewins employees made an Apollo booking, a record of that booking was automatically sent to the Apollo central computer in Denver, Colorado. In Denver, the data were stored until after the travel took place. Shortly after the travel was concluded, the records were stripped of identifying information, such as the passenger name and travel destination, and then "downloaded to tape" for storage. After sending Hewins a notice of the breach, Covia used the stored information to generate reports reflecting the total monthly bookings at each Clapp/Hewins location. Covia used the first six months' usage to calculate the monthly minimum usage requirement and the subsequent months' usage to establish a breach of that minimum usage term.

 Hewins argues the computer records are inadmissible summaries because Covia failed to supply the originals as required by M.R.Evid. 1006.[4] Contrary to Hewins's contention, the computer records in question are printouts of the usage data stored on computer tape and are therefore themselves originals pursuant to M.R.Evid. 1001(3) which reads in pertinent part:

> If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an "original."

*Id.* Although Hewins contends that M.R.Evid. 1001(3) does not apply because the records were not "shown to reflect the data accurately," Covia provided an adequate foundation for the trial court to find

that the printout was an accurate reflection of the data stored in the Apollo central computer. Covia's computer records, therefore, are not barred by Rule 1006.

Hewins further argues that the computer records are hearsay not admissible under the business records exception. *See* M.R.Evid. 803(6).[5] To fall within the business record exception to the hearsay rule, the proponent must show that:

1) the record was made at or near the time of the transaction by a person with knowledge of the event;
2) the record was kept in the regular course of business; and
3) the business had a regular practice of making such records.

*State v. Brunette,* 501 A.2d 419, 426 (Me. 1985). The first requirement is easily met because the data were sent to Denver simultaneous with the entry of a booking by the Clapp or Hewins agents. The third requirement is also satisfied because Tarrant's affidavit stated without contradiction that Covia had a regular practice of making such records.

 Hewins argues, however, that the second requirement is not satisfied because Covia generated the reports years after the bookings were made and in preparation for litigation and therefore not as part of its regularly conducted business. Hewins improperly focusses on the time of printing the records rather than the entry of the raw data. In order to be admissible under M.R.Evid. 803(6), the *raw data* must be entered at or near the time of the event recorded and in the normal course of business. *See United States v. Loney,* 959 F.2d 1332, 1340–41 (5th Cir.1992) (holding that identical Fed.R.Evid. 803(6) "does not require the *summary* of the data be kept

---

4. M.R.Evid. 1006 reads, in pertinent part:
 The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The original shall be made available for examination or copying, or both, by other parties at a reasonable time and place.

5. M.R.Evid. 803(6) reads:
 (6) **Records of regularly conducted business.** A memorandum, report, record, or data com-

pilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. . . .

in the regular course of business ... [r]ather, it is the underlying data that must be so kept."). The Nebraska Supreme Court rejected the contention that because a printout was made in preparation for trial, it was not a record kept in the regular course of business stating that:

> [this contention] exalts the form over the substance. The retrieval from the taped record ... was made for the purpose of the trial. But, the taped record and the information and calculations thereon were made in the usual course of business and for the purpose of the business alone.

*Transport Indemnity v. Seib*, 178 Neb. 253, 132 N.W.2d 871, 875 (1965); *see also Westinghouse Elec. Supply Co. v. B.L. Allen, Inc.*, 138 Vt. 84, 413 A.2d 122, 131–32 (1980) (same). There is no question that the booking information was entered by the Hewins/Clapp agents at or near the time of the booking as part of their regular course of business. The evidence also established that Covia used this data in its regular course of business to invoice other vendors for booking fees and to monitor the productivity of its subscriber agencies.

 In addition to the three-point test business records must also be trustworthy both in their "source of information" and "method or circumstances of preparation." M.R.Evid. 803(6). The decision whether to exclude business records on the basis of untrustworthiness is within the discretion of the trial court. *State v. Brunette*, 501 A.2d 419, 426 (Me.1985). A finding of untrustworthiness is usually predicated on:

> a finding that the record was altered after it left the control of the preparer or custodian of the report, or that the preparer had some motivation to misrepresent or misstate results contained in the report, or that the report was prepared in anticipation of litigation.

*State v. Therriault*, 485 A.2d 986, 996 (Me. 1984) (citations omitted). Hewins asserts that the data were not reliable pointing to alleged problems that Clapp had with the interface between its CRTs and in-house bookkeeping system. In an affidavit,

Kathleen Hewins asserted on information and belief, that the interface between the CRTs and the bookkeeping system did not work properly "necessitating the manual inputting of the data relating to customer reservations." Even assuming this is true it would lead to an underreporting of bookings rather than an overreporting as argued by Hewins. Although we look at the evidence in the light most favorable to Hewins as the party against whom the summary judgments were granted, we find no abuse of discretion in the trial court's finding the records trustworthy.

Hewins finally argues that if the computer records are admissible, the weight and credibility of the records should be a question for the jury. Even viewing the evidence in the light most favorable to Hewins, we find no abuse of discretion in the trial court's determination that the credibility of the records was not challenged adequately to create an issue of material fact for the jury.

### III.

#### *Ambiguity*

 Hewins asserts that the term "Apollo Transaction" is ambiguous because the term could mean either each segment of a flight or the entire ticketed flight. The contracts define "Apollo Transaction" as:

> a transaction processed through Apollo Services including but not limited to, an airline, hotel, tour, or car rental reservation, or any other travel related service transaction, that is not subsequently canceled and (i) results in a fee payable to United from the vendor involved, or (ii) is a booking for United's services.

The contracts provide and the parties agree that any dispute arising under the Apollo contracts shall be governed by Illinois law. Under Illinois law, a court may, on a motion for a summary judgment, consider uncontroverted evidence of trade usage or custom in order to determine whether a term is ambiguous. *See Advance Mortgage Corp. v. Concordia Mutual Life Assoc.*, 135 Ill.App.3d 477, 90 Ill.Dec. 225, 229–30, 481 N.E.2d 1025, 1029–30 (1985).

The uncontradicted evidence before the court was that, according to prevailing trade usage, booking fees result from each segment of a flight ticket rather than the whole ticket. The court, therefore, did not err in finding the term "Apollo Transaction" unambiguous.

## IV.

### Liquidated Damages

▉▉▉▉▉▉ Hewins asserts that the liquidated damages clause is void and unenforceable as a penalty.[6] We disagree. The Illinois Supreme Court has adopted the first Restatement approach to liquidated damages. *See Bauer v. Sawyer,* 8 Ill.2d 351, 134 N.E.2d 329, 333 (1956). Illinois law requires that, *at the time of contracting:* 1) the liquidated damages clause must be a reasonable forecast of just compensation for harm caused by the breach; and 2) the harm caused by the breach would without the liquidated damages clause be, at least, very difficult to accurately determine. *Id. citing Restatement of Contracts* § 339(1); and *Arduini v. Board of Educ.,* 93 Ill.App.3d 925, 49 Ill.Dec. 460, 465, 418 N.E.2d 104, 109 (1981), *rev'd on other grounds,* 92 Ill.2d 197, 65 Ill.Dec. 281, 441 N.E.2d 73 (1982). Under Illinois law, a liquidated damages clause will generally be upheld unless the liquidated amount is found to be a penalty because it is plainly or grossly disproportionate to the probable loss anticipated when the contract was executed. *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1289–90 (7th Cir.1985) (applying Illinois law).

▉▉▉▉ Under the contracts, United (and then Covia) received from Hewins a fixed monthly fee for the equipment as well as a variable subscription charge based on Hewins' usage. When Hewins breached its contracts with Covia, Covia lost both of these charges. The variable charges are based on usage which could not be determined at the time of contracting; therefore, the liquidated damages formula incorporates the variable charges for the month prior to termination. The bulk of Covia's revenue from the contract arises from a third source, booking fees from vendors of other travel services paid to Covia for each booking Hewins made using the Apollo system. Since the amount of booking fees the Hewins contract would generate for Covia was also impossible to calculate at the time of contracting, the booking fee component of the liquidated damages formula is based on the monthly usage during the first six months of the contract.

Covia does avoid some costs when it loses a subscriber. The uncontradicted estimate of those avoidable costs was less than 20% of the fixed and variable charges. In order to account for its avoidable costs, therefore, the liquidated damages clause provides for recovery of only 80% of fixed and variable charges for the remaining months of the contract term.

Since Covia's damages from lost bookings and variable fees were incapable of precise estimation at the time of contracting, *see United Air Lines, Inc. v. Austin Travel Corp.,* 681 F.Supp. 176, 187 (S.D.N.Y.1988), *aff'd.* 867 F.2d 737 (2d Cir. 1989) (interpreting identical clause to hold same); and the liquidated damages formula was a reasonable forecast of damages caused by a breach, *see id.* (holding same), the clause is not an unenforceable penalty.

**6.** The liquidated damages clause in the Apollo contracts provides:

> Subscriber will pay to United liquidated damages in an amount calculated as follows:
> A. The amount of the monthly fixed charge ... will be multiplied by the number of months ... remaining under the term of this Agreement and the product thereof multiplied by .80;
> B. The amount of the variable charges ... paid by the Subscriber for the calendar month immediately preceding the date of termination will be multiplied by the number of

months ... remaining under the term of this Agreement and the product thereof multiplied by .80;
> C. The Monthly Minimum Guarantee will be multiplied by the amount of the airline booking fee in effect on the date of termination and the product thereof multiplied by the product of the number of months ... remaining under the terms of this Agreement multiplied by the number of Apollo CRT's ...; and
> D. The amount of the liquidated damages will equal the sum of the amounts derived under [A., B., and C.].

## V.

### Post-judgment Attachment

██ After the court granted the summary judgments to United and Covia, Covia moved for an *ex parte* attachment and attachment by a trustee process. The court denied the motion on the ground of insufficient statutory authority for a post-judgment attachment and an attachment by a trustee process. We reject Hewins' contention that this issue is moot and find adequate statutory support for a post-judgment attachment. *See* 14 M.R.S.A. § 4651–A(6) (Supp.1992) (referring to "post-judgment attachment"); 14 M.R.S.A. § 4151 (Supp.1992) ("All goods and chattels may be attached and held as security to satisfy the judgment for damages and costs which the plaintiff may recover ... Following the entry of judgment in a civil action and prior to the issuance of a writ of execution upon the judgment, any interest in real or personal property ... may be attached by the plaintiff."). There is, however, no such statutory authority for attachment by a trustee process.

The entry is:

The summary judgments for United and Covia affirmed.

Remanded to the Superior Court for consideration of Covia's motion for a post-judgment attachment.

All concurring.